[Civ. No. 20032.   First Dist., Div. One.   Apr. 18, 1963.]

THOMAS WESLEY GIPSON, a minor, etc., et al., Plaintiffs and Appellants, v. DAVIS REALTY COMPANY, Defendant and Respondent.

192

194

‚ Walkup & Downing, Bruce Walkup, Robert Ransom and William B. Boone for Plaintiffs and Appellants.

Hadsell, Murman & Bishop, Bishop, Murray & Barry, Herbert Chamberlain and Nelson Barry for Defendant and Respondent.

MOLINARI, J.—This is an appeal from a judgment in favor of the defendant, Davis Realty Company, a corporation, in an action for damages for personal injuries.

### Statement of the Case

On April 4, 1957, Mrs. Jane Gipson, who was pregnant with child, was being transported by ambulance to the Stanford Hospital where her child was to be delivered. A collision between the ambulance and an automobile owned and driven by Roland Shugg occurred at the intersection of 26th Avenue and Clement Street in San Francisco. The accident occurred at about 12:20 p.m. The child was born about 40 minutes after the accident. The child showed signs of brain damage immediately after the accident, it being subsequently determined that such damage was permanent and that the child was suffering from a disability diagnosed as cerebral palsy. A personal injury action was thereafter instituted by the child's father, Edward T. Gipson, as guardian *ad litem* on behalf of the child, by the said father in his individual capacity, and by Mrs. Gipson against the ambulance company and its driver, and against Shugg and Davis Realty Company, a corporation, as the alleged employer of Shugg. The cause proceeded to trial ultimately with the child (by his said guardian) and Edward T. Gipson, individually, as plaintiffs, and Davis Realty Company as the sole defendant. A trial was had before a jury and a verdict was returned against the plaintiffs[1] and for the defendant.[2] No attack is made on this appeal as to the substantiality of the evidence, the appeal being directed to the propriety of certain instructions and rulings made by the trial court.[3]

[1] Hereinafter referred to as appellants.
[2] Hereinafter referred to as respondent.
[3] In discussing such instructions and rulings we shall hereinafter refer to such facts in the record as shall be pertinent thereto.

### Did the Court Commit Prejudicial Error in the Giving of Instructions Regarding Burden of Proof?

■ The trial court gave an instruction on its own motion as follows: ''Where the evidence is contradictory, your decision must be in accordance with the preponderance thereof. It is your duty, however, if possible to reconcile such contradiction so as to make the evidence reveal the truth. *If you are in doubt as to the preponderance of the whole evidence, then you must resolve that doubt in favor of the party who has not the burden of proof.*''[4] (Italics added.) The appellants assert that this instruction is prejudicially erroneous in that it tells the jury that the appellants were required not only to prove their case by a preponderance of the evidence, but that they were required to convince the jury *beyond all doubt* as to the sufficiency of their proof.

A reading of the instruction does not indicate that the jury was told that the appellants were required to prove their case beyond *all* doubt. What the jurors were told, however, was that if they were in doubt as to whether the evidence preponderated in favor of the appellants, they were then to find that the appellants had not met the burden of proof. While we are of the opinion that instructions using the word ''doubt'' ought to be avoided in civil cases on the subject of burden of proof and preponderance of the evidence, we do

---

[4]Other instructions were given by the court on the subject of burden of proof, as follows:

(a) ''In Civil actions, and this is a Civil action, the party who asserts the affirmative of an issue must carry the burden of proving it. This means that if no evidence were given on either side of such issue, your findings as to it would have to be against that party. In determining whether the burden of proof has been sustained you will consider all of the evidence bearing upon the issue, regardless of which party introduced it.''

(b) ''In civil cases a preponderance of evidence is all that is required, and the burden rests upon one who asserts the affirmative of an issue to prove his allegations by a preponderance of evidence.''

(c) ''By a preponderance of evidence is meant such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability is in favor of the party upon whom the burden of proof rests.''

(d) ''Preponderance of evidence means not the greater number of witnesses, but the greater weight, probability, quality and convincing effect of the evidence, and proof offered by the party holding the affirmative as compared with the opposing evidence.''

(e) ''Whenever, in these instructions, I state that the burden of proof rests upon a certain party to prove a certain allegation made by him, the meaning of such an instruction is this: That unless the truth of that allegation is proved by a preponderance of the evidence, you shall find that allegation to be not true.''

not believe that the instant instruction is erroneous. Although, inartfully drawn, its effect, when coupled with the other instructions given by the court on the subject,[5] was to tell the jury that if, after weighing the whole evidence in the case, they were in the subjective state of being uncertain as to whether the evidence tending to prove the appellants' allegations had the greater weight, probability, quality and convincing effect than that presented by the opposing evidence, they were to decide that the appellants had not met the burden of proof. The jurors were not told by this instruction that the things which the appellants were required to prove must not admit of any doubt, but rather, that, if after weighing the *whole* evidence in support of these things, they were in the frame of mind where they could not say that such evidence preponderated on the side of the appellants, they were to conclude that it did not so preponderate.

The appellants have cited several cases in support of their assertion of error,[6] but these are distinguishable from the instruction in the instant case primarily because of the specific language used, and the connotation it conveyed, that the degree of certainty indicated with reference to the particular allegations to be proved must not only be beyond doubt, but must not admit of any doubt at all. In *Greenleaf* v. *Pacific Tel. & Tel. Co.*, 43 Cal.App. 691, 693 [185 P. 872], the portion of the instruction which resulted in a reversal read as follows: " '[A]nd if the preponderance of the evidence fails to satisfy you that the fire was so caused, *or leaves in your mind any doubt, confusion or uncertainty as to the origin of the fire, your verdict should be for the defendant.' "
(P. 693.) The erroneous instruction given in *Colbert* v. *Borland*, 147 Cal.App.2d 704, 712 [306 P.2d 53], stated that: " 'The burden is upon each plaintiff in these cases to prove the affirmative of his case by a preponderance of the evidence. Therefore, you may not speculate as to whether any conduct on the part of either defendant was a proximate cause of the accident or of any one of plaintiff's injuries or damages, and if the evidence *leaves these things* a matter of conjecture *or doubt*, then that plaintiff has not sustained the burden of

---

[5]The questioned instruction followed the other instructions on burden of proof which we have set out in footnote 4.

[6]*Greenleaf* v. *Pacific Tel. & Tel. Co.*, 43 Cal.App. 691 [185 P. 872]; *Colbert* v. *Borland*, 147 Cal.App.2d 704 [306 P.2d 53]; *Meschini* v. *Guy F. Atkinson Co.*, 160 Cal.App.2d 609 [325 P.2d 213]; *Banes* v. *Dunger*, 181 Cal.App.2d 276 [5 Cal.Rptr. 278]; *Perrett* v. *Southern Pac. Co*, 73 Cal.App.2d 30 [165 P.2d 751].

proof required of him under the law as against that defendant.' " (Italics partly added.) The instruction given in *Meschini* v. *Guy F. Atkinson Co.*, 160 Cal.App.2d 609, 615 [325 P.2d 213], was almost identical to the one condemned in *Colbert*. In *Banes* v. *Dunger*, 181 Cal.App.2d 276, 282 [5 Cal.Rptr. 278], the court gave an instruction to the effect that the jury was not to speculate as to any injuries claimed by the plaintiffs, and that *if the evidence left the existence or cause of any alleged injuries a matter of conjecture or doubt*, that then the plaintiffs had not sustained the burden of proof. The *Perrett* v. *Southern Pac. Co.*, 73 Cal.App.2d 30 [165 P.2d 751], case did not involve the use of the word "doubt." There an instruction was given that the defendant could be held liable only " 'upon *proof which satisfies your mind* that the plaintiff's injuries were proximately caused by some negligence upon its part.' " (P. 38; italics added.)

In *Popejoy* v. *Hannon*, 37 Cal.2d 159 [231 P.2d 484], the court on its own motion instructed that: " 'The defendants, however, are not required to prove by a preponderance of the evidence that they were free from negligence which proximately caused the lumber to fall. They are bound to produce only sufficient evidence to create in your minds such doubt as to why the lumber fell that you cannot say you are convinced by a preponderance of the evidence that the falling of the lumber was proximately caused by the negligence of the defendants.' " (Pp. 164-165.) The defendants there complained of the instruction, and while the appellate court had some misgivings as to the instruction (not because of the use of the word "doubt," but because it tended to place upon the defendants the requirement to present direct evidence either of their freedom from negligence or the absence of proximate cause), it held that the instruction was not prejudicial under circumstances wherein an instruction was given at the request of the defendants substantially in the form of BAJI No. 21.[7] The court there said that there was "little difference" between the challenged instruction and the one requested by the

---

[7]The said instruction read as follows:

" 'When the evidence is contradictory, the decision must be made according to the preponderance of evidence, by which is meant such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein. Should the conflicting evidence be evenly balanced in your minds, so that you are unable to say that the evidence on either side of the issue preponderates, then your finding must be against the party carrying the burden of proof, namely, the one who asserts the affirmative of the issue.' " (Pp. 165-166.)

defendants, and that "The effect of the instruction complained of was to say that the Hannons [the defendants], in order to defeat Popejoy's [the plaintiff's] claim, had the duty to produce a preponderance of evidence to the contrary."[8] (P. 165.)

It should be here noted that the appellants themselves claim error on the part of the court in failing to give an instruction requested by them containing the following language: "It is the duty of the jury to decide for the plaintiff if the weight of the evidence preponderates, according to the reasonable probability of truth, in favor of the plaintiff's claims, *even though the minds of the jurors are not free from doubt.*" (Italics added.) The court did not give this instruction but placed thereon the notation: "Given as Modified." The court was apparently of the opinion that in essence this instruction was covered by the subject instruction to the extent that the former was modified by the latter. We see little difference between the two instructions. Suffice it to say, the terminology "greater probabilities of truth," "probability of the truth" and the "greater probability" with reference to the meaning of "preponderance of evidence" in burden of proof instructions is in common use by the courts and has been approved. (See *Popejoy* v. *Hannon, supra,* 37 Cal.2d 159; and see BAJI No. 21, rev. 1962.)[9] The word "probability" by its very definition leaves some room for doubt. In *Brown* v. *Beck,* 63 Cal.App. 686 [220 P. 14], we find the following language: " 'Probability' means the state or character of being probable. Webster's and the Century dictionaries define 'probable' as follows: 'Having more evidence for than against; supported by evidence which inclines the mind to belief but leaves some room for doubt; likely.' This definition is accepted in numerous cases in which the word 'probable' is construed." (Pp. 697-698.)

*Did the Court Commit Prejudicial Error in the Giving and Refusing to Give Instructions as to the Effect of the Employment Contract?*

At the time of the accident in question Shugg was one of four stockholders in the respondent corporation. He was neither an officer nor a director of the corporation. On February 19, 1957, Shugg entered into a contract with the re-

[8]That is, to establish the defense of contributory negligence.

[9]This terminology appears in the instructions given by the court in the present case. See footnote 4, instructions (c) and (d).

spondent entitled "Desk Space Contract with Tenant-Salesman." According to said contract Shugg agreed to pay 50 per cent of the profits from his real estate activities in exchange for the desk space, telephone, stenographic, and bookkeeping services located at 5000 Geary Boulevard, San Francisco. The said agreement further provided that Shugg was not to be deemed to be an employee of the respondent, and that the latter did not control or have any right of control over Shugg's acts. Attached to the contract was a separate agreement concerning the disposition of gross commissions, a detailed schedule setting out the division of various sales commissions, and a list of working conditions one of which was that all *employees* were required to show a Mrs. McAnaw[10] that they carried adequate automobile liability insurance. Other conditions and stipulations made reference to "salesman" and to "broker." Testimony was adduced at the trial to the effect that the above contract was entered into with the intent of saving the necessity of keeping bookkeeping records and with the intent on the part of the respondent to treat its salesmen as independent contractors. Shugg testified, however, that it was not the intent to make the salesmen independent contractors because the salesmen knew that they could not be such as they were not licensed as brokers.

The evidence discloses that Shugg was licensed as a real estate salesman only, and that he never had been licensed as a broker. It appears that all transactions entered into by Shugg were in compliance with the California Business and Professions Code regulating real estate transactions; that all real estate deals made by Shugg were made in the name of "Davis Realty"; that deposit receipts and similar papers were signed " 'Davis Realty, by R. P. Shugg' "; and that all listings brought in by Shugg were signed as listings of Davis Realty which would remain the property of Davis Realty if Shugg resigned. There was testimony, also, that all advertising was in the name of Davis Realty; that Shugg, when conducting a transaction, represented to customers that he was acting for Davis Realty; that the salesmen were expected to rotate "floor days" during which they stayed in the office all day, took calls, and met people who came in off the street; and that Shugg was required, as a salesman, to satisfy Mrs. McAnaw that he had adequate automobile liability insurance.

---

[10]Mrs. McAnaw was an employee-secretary of respondent corporation.

The "Working Agreement" referred to above provided that all salesmen could be terminated on 30-day notice. In this regard, Shugg testified that a couple of salesmen were asked to transfer their licenses to other brokers; and Ross, respondent's president, testified that while the company had never fired anyone, a couple of salesmen were asked to terminate because of an infraction of policy.

After defining for the jurors the meaning of "independent contractor" and "agent," and instructing them that if they found Shugg to be an independent contractor then the respondent would not be liable, but if they found him to be an agent, acting within the scope of his authority at the time of the accident, the respondent would be liable, the court gave the following instruction with regard to the employment contract between Shugg and Davis Realty Company, to wit: "The contract which exists between the Davis Realty Company and Roland Shugg is prima facie evidence of the relationship between them. That is to say in the absence of any other evidence it is the controlling factor in determining whether or not Roland Shugg was at the time of the accident an independent contractor. However, where further evidence is introduced with respect to the actual working arrangement between the parties you *may* take this into consideration in making your decision as to the relationship between the parties. You may look at the actual working arrangement in the light of the rules previously read to you and recall that the decisive test of the relationship is who has the right to direct what shall be done, when and how it shall be done. Or to put the test in another form, who has the right to general and immediate control over the progress and method of the work involved." (Italics added.)

The appellants contend that prejudicial error was committed by the trial court in the giving of this instruction. The objection is directed to the use of the words "prima facie evidence" and "controlling factor. . . ." It is argued by the appellants that this instruction purported to attribute to the contract some conclusive or presumptive effect. The appellants assert that the jury could find by the other evidence produced that the true relationship between Shugg and Davis Realty was that of principal and agent and that in so doing the jury was at liberty to ignore the provisions of the contract which purport to negate such relationship. The appellants argue further that while the court did instruct the jury that it "may" consider such other evidence, a correct instruc-

tion would have stated that it "must" consider such evidence. The proper instruction, say the appellants, was that embodied in their proposed instruction number 65, which the court refused to give.[11] The appellants claim that such refusal was prejudicial error.

■ The instruction given was a correct statement of the law insofar as it declared that the relation of the parties to a written contract of employment is prima facie that which is expressed by the terms of their writing. (*Luckie* v. *Diamond Coal Co.*, 41 Cal.App. 468, 479 [183 P. 78]; *Stewart & Nuss* v. *Industrial Acc. Com.*, 55 Cal.App.2d 501 [130 P.2d 985].)

■ It is proper, moreover, in view of the established rule that parol evidence is admissible in an action by one not a party to an employment contract to show the true relationship between the parties (*Broder* v. *Epstein,* 101 Cal.App.2d 197, 199 [225 P.2d 10]; *Marx* v. *McKinney,* 23 Cal.2d 439, 442 [144 P.2d 353]; *Luckie* v. *Diamond Coal Co., supra,* p. 478; and see Code Civ. Proc., § 1856), for a trial court to admit extrinsic evidence to be weighed against the presumption afforded by such prima facie evidence. Such extrinsic evidence was so admitted in the present case. The questioned instruction, however, tells the jury that it "may" take such evidence into consideration. ■ While in the construction of statutes the word "may" is often interpreted to mean "must" or "shall," the word is primarily and ordinarily a permissive term and is so understood by laymen. The word "may" here imported to the jury that it might, or might not, at its option, consider such evidence. (See *White* v. *Disher,* 67 Cal. 402, 404 [7 P. 826].) ■ A jury is duty bound to consider and weigh *all* of the evidence received by the court under appropriate instructions. (*Borenkraut* v. *Whitten,* 56 Cal.2d 538, 546 [15 Cal.Rptr. 635, 364 P.2d 467]; *Ensign* v. *Southern Pac. Co.,* 193 Cal. 311, 323 [223 P. 953].) The in-

---

[11]The proposed instruction was as follows:

"'The designation of a party in a contract as an independent contractor is not conclusive. Although a contract is drawn with the purpose of creating the appearance of an independent contractor relationship, nevertheless the conduct of the parties to the contract may show that the true relationship between the parties was that of principal and agent. In considering the contract between Mr. Shugg and defendant, Davis Realty Company, you must consider not only the terms of the contract, but also the circumstances under which it was made and the conduct of the parties under the contract. If the true relationship between the parties was that of principal and agent, then Davis Realty Company could not avoid responsibility for the conduct of Mr. Shugg merely by providing in the contract that he was not an employee of the company.'"

struction proposed by the appellants, on the other hand, appears to state the rule of *Broder* and *Luckie* correctly and should have been given by the court,[12] assuming, of course, that it was proper for the court to instruct on the effect of the employment contract.

We are of the opinion, however, that it was error for the court to have given any instructions on the effect of the employment contract because Shugg was an agent of the respondent as a matter of law. A proper instruction, therefore, would have been one so advising the jury. In *Grand* v. *Griesinger*, 160 Cal.App.2d 397 [325 P.2d 475], it was held that a real estate salesman *"is strictly the agent of the broker."* (P. 406; italics added.) The appellate court was there called upon, in a salesman license revocation case, to interpret the Real Estate Act (Bus. & Prof. Code, §§ 10000-11709) in its application to the relationship between a real estate broker and a real estate salesman. In discussing the applicable statutes the reviewing court pointed out that " [t]he differences in language are small, but the divergence in import is large." (P. 405.) After citing sections 10131[13] and 10132,[14] defining "real estate broker" and "real estate salesman," respectively, the court observed as follows: "A broker performs the specified services 'for another or others,' meaning the public, while a salesman must be '*employed* by a licensed real estate broker.' Both act for compensation, but the salesman cannot 'be employed by or accept compensation from any person other than the broker under whom he is at the time licensed.'" (P. 405; italics added; citing § 10137.) The

[12]It appears to us, however, that the word "should" is preferable to the word "must" because the latter may be interpreted as signifying compulsion rather than the more appropriate idea of bounden duty.

[13]All section references herein relate to the Business and Professions Code unless otherwise noted.

[14]At the time pertinent to the instant case section 10132 read as follows:

"A real estate salesman within the meaning of this part is a natural person who, for a compensation or in expectation of a compensation, is employed by a licensed real estate broker to sell, or offer for sale, or to list, or to buy, or to offer to buy, or to negotiate the purchase or sale or exchange of real estate, or to solicit the prospective purchasers of real estate, or to solicit borrowers or lenders for or negotiate a loan on real estate, or to lease, or to negotiate the sale, purchase or exchange of leases, or offer to lease, rent or place for rent, any real estate, or improvements thereon." (This section read substantially the same when discussed by *Grand* v. *Griesinger*, 160 Cal.App.2d 397, 405 [325 P.2d 475]. It should be noted that in 1961 this section was amended to provide that a salesman can do any of the acts which a real estate broker may do.)

court went on to point out that a salesman can only get a license on the recommendation of the broker *who is to be his employer* (§ 10151); that when a salesman's application is granted his license goes into possession of his *broker-employer* and there remains until cancelled or the salesman leaves the *employ* of the broker (§ 10160); and that the broker must " 'exercise reasonable supervision over the activities of his salesmen' " or hazard the suspension or revocation of his own license (§ 10177, subd. (h); p. 405]. The conclusion reached by *Grand,* after a review of the foregoing statutes and other related provisions, is that: "The entire statutory scheme requires the broker actively to conduct his brokerage business and to supervise the activities of his salesmen." (P. 406.)

The respondent maintains that whether a real estate salesman is an employee or agent on the one hand, or an independent contractor on the other, is a question of fact dependent upon the particular circumstances of each case. In support of this proposition it cites the following cases: *California Emp. Stab. Com.* v. *Norins Realty Co.* (1946) 29 Cal. 2d 419 [175 P.2d 217]; *California Emp. Stab. Com.* v. *Morris* (1946) 28 Cal.2d 812 [172 P.2d 497]; and *Royal Indem. Co.* v. *Industrial Acc. Com.* (1930) 104 Cal.App. 290. [285 P. 912]. In *Morris* the question before the Supreme Court was whether a real estate salesman was to be deemed "in employment" within the meaning of the Unemployment Insurance Act. The court held that "[t]he Real Estate Act . . . does not establish as a matter of law the status of every salesman as being 'in employment' within the meaning of the Unemployment Insurance Act." (P. 817.) The rationale of *Morris* is that " [t]he Real Estate Act of this state does not expressly give the employer the right to control the manner and means of accomplishing the result desired, nor do its provisions conclusively negative all of the other factors to be considered in determining whether one is an independent contractor. Accordingly, the occupation of real estate salesman, *insofar as the Unemployment Insurance Act is concerned,* is one that may be classified as that of an employee, or an independent contractor, depending upon the facts of the particular case." (P. 818; italics added.) *Norins Realty Co.* also involved the applicability of the Unemployment Insurance Act to real estate salesmen. It follows the holding in *Morris.* The *Royal Indem. Co.* case was concerned with workmen's compensation benefits. Like *Morris,* it held that whether the relationship of a real estate salesman to a broker is that of

an employee or independent contractor is a question depending upon the facts of the particular case. The holding there turned upon the lack of any evidence showing control over the means, manner or mode of the work exercised by the salesman.

We are persuaded that the distinction between *Grand,* on the one hand, and *Morris, Norins Realty Co.* and *Royal Indem. Co.,* on the other, lies in the difference between an "employee" and an "agent." The basis of the holding in *Morris* and *Norins Realty Co.,* with reference to the Unemployment Insurance Act, and *Royal Indem. Co.,* with reference to the Workmen's Compensation Act, is that, insofar as these acts are concerned, the common law definition of master and servant is the measure of the relationship between the parties, and that the statutory definition of salesman in the Real Estate Act does not make a real estate salesman an "employee" within the meaning of these acts as a matter of law. ■ An "employee" is one who is subject to the absolute control and direction of his employer in regard to any act, labor or work to be done in the course and scope of his employment. (*Crooks* v. *Glens Falls Indem. Co.,* 124 Cal. App.2d 113, 121 [268 P.2d 203].) The term "employee" has been held to be synonymous with the word "servant." (*Press Pub. Co.* v. *Industrial Acc. Com.,* 190 Cal. 114, 122 [210 P. 820]; *Western Indem. Co.* v. *Pillsbury,* 172 Cal. 807, 810 [159 P. 721].) Section 3000 of our Labor Code (formerly Civ. Code, § 2009) defines a servant as follows: "A servant is one who is employed to render personal service to his employer, other than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer, who is called his master." An "agent" is defined by section 2295 of the Civil Code as follows: "An agent is one who represents another, called the principal, in dealings with third persons." While one may be both a servant and an agent (*Ingle* v. *Bay Cities Transit Co.,* 72 Cal.App.2d 283, 286 [164 P.2d 508]), the terms are not wholly synonymous. (*People* v. *Treadwell,* 69 Cal. 226, 236 [10 P. 502].) Although both relate to voluntary action under employment and express the idea of service, the service performed by a servant may be inferior in degree to work done by an agent for his principal. ■ Accordingly, while both a servant and an agent are workers for another under an express or implied employment, an agent works not only *for,* but *in the place of,* his

principal. (*People* v. *Treadwell, supra*, p. 236.) It is apparent from a reading of section 3000 of the Labor Code that the relationship of master and servant contemplates that the servant be *entirely* under the control and direction of the employer; it presupposes also the right to direct the method and mode of doing the service. (See *Fay* v. *German General Benevolent Soc.*, 163 Cal. 118, 121 [124 P. 844]; *Chinnis* v. *Pomona Pump Co.*, 36 Cal.App.2d 633, 637 [98 P.2d 560].)

█ The distinguishing features of an agency, on the other hand, are its representative character and its derivative authority. (*Store of Happiness* v. *Carmona & Allen, Inc.*, 152 Cal.App.2d 266, 269 [312 P.2d 1104].) █ As stated in *Wallace* v. *Sinclair*, 114 Cal.App.2d 220 [250 P.2d 154]: "Agency is the relation that results from the act of one person, called the principal, who authorizes another, called the agent, to conduct one or more transactions with one or more third persons and *to exercise a degree of discretion* in effecting the purpose of the principal. The heart of agency is expressed in the ancient maxim: '*Qui facit per alium facit per se.*' " (P. 229; italics partly added.)

It should be noted, moreover, that *Morris, Norins Realty Co.* and *Royal Indem. Co.* were decided prior to the addition by the Legislature in 1955 of subdivision (h) to section 10177, providing an additional ground for the suspension or revocation of a real estate broker's license, i.e., that such broker's license may be suspended or revoked if he fails "to exercise reasonable supervision over the activities of his salesmen." The presence of this provision in the Real Estate Law, read in conjunction with the other provisions applicable to real estate salesmen, was deemed by the reviewing court in *Grand* to be indicative of a legislative intent to create by statute, as between a real estate broker and the salesman licensed under such broker, respectively, the relationship of principal and agent.

█ We are satisfied, accordingly, that while it may be a question of fact whether in each case a real estate salesman is an employee within the common law definition of master and servant, the Legislature has, by virtue of statutory enactment, made such a salesman an agent of the broker as a matter of law. █ A consideration of the several statutory provisions applicable to a real estate salesman impels the conclusion that such person can act only for, on behalf of, and in place of the broker under whom he is licensed, and that his acts are limited to those which he does and per-

forms as an agent for such broker. (*Galbavy* v. *Chevelin Realty Corp.*, 58 Cal.App.2d Supp. 903, 906 [136 P.2d 134].) █ We conclude, therefore, that a salesman, insofar as his relationship with the broker who employs him is concerned, cannot be classed as an independent contractor. Accordingly, any contract which purports to change that relationship from that of agent to independent contractor is invalid as being contrary to the provisions of the Real Estate Law. (See Civ. Code, §§ 1608, 1667.) █ It was reversible error for the court, therefore, to instruct the jury that the contract of employment between Shugg and the respondent was "prima facie" evidence of their relationship in view of the terms of the contract providing that the relationship was that of independent contractor. In the absence of such error it is reasonably probable that a result more favorable to the appellants might have been reached. (See *People* v. *Watson,* 46 Cal.2d 818, 835-836 [299 P.2d 243].)

While the error in this latter respect was induced by both the respondent and the appellants, it was not "invited error" on the part of appellants. The case was tried on the theory that the question whether Shugg was an independent contractor was one of fact for the jury and instructions were submitted by both sides not only on the effect of the subject employment contract, but on the meaning and definition of the relationship of independent contractor. █ It is well settled law that where a litigant invites error by offering instructions on a certain issue, he is in no legal position to complain that it was error to give instructions offered by the adversary, or given by the court on the same issue. (*Fuentes* v. *Panella,* 120 Cal.App.2d 175, 182 [260 P.2d 853]; *Wells* v. *Lloyd,* 21 Cal.2d 452 [132 P.2d 471].) █ In the instant case the doctrine of invited error would preclude the appellants from complaining that the court instructed on *the issue* of whether or not Shugg was an independent contractor and of the effect of the employment contract with respect to the relationship between the respondent and Shugg. The doctrine does not, however, estop the appellants from urging on appeal that an instruction given on that issue was in fact erroneous. As we have pointed out above, even if it had been proper for the court to instruct on the effect of the employment contract with respect to the relationship in question, the instruction given on the subject was prejudicially erroneous. The doctrine of invited error precludes a party from an objection on appeal to an instruction substantially the same

as the one requested by him, or invited by an instruction requested by him, or to the part of an instruction containing the same vice as the one submitted by him. (*Jentick* v. *Pacific Gas & Elec. Co.*, 18 Cal.2d 117, 122 [114 P.2d 343]; *Smith* v. *Kile*, 147 Cal.App.2d 314, 317 [304 P.2d 1034]; *Jansen* v. *Southern Pac. Co.*, 112 Cal.App.2d 833, 845 [247 P.2d 581]; *Yolo Water & Power Co.* v. *Hudson*, 182 Cal. 48, 51 [186 P. 772]; *George* v. *City of Los Angeles*, 51 Cal.App. 2d 311, 319-320 [124 P.2d 872].) In the present case the instruction submitted by the appellants on the effect of the employment was substantially different from that submitted by the respondent; it did not contain the same vice. ▮ The doctrine of invited error does not apply where the instruction objected to on appeal contains elements or additions substantially different from that contained in the instruction submitted by appellant, particularly where such instruction is prejudicial to him and is not the law. (*Baker* v. *Borello*, 131 Cal. 615, 616-617 [63 P. 914]; *Dowd* v. *Atlas Taxicab etc. Co.*, 69 Cal.App. 9, 14 [230 P. 958].)

### *Did the Court Commit Error in Refusing Instructions Defining the Right of Control and the Factors to be Considered?*

Substantial evidence regarding the control of the respondent over Shugg was submitted by both parties on the issue of whether Shugg was an agent or independent contractor, and instructions on the subject of control were given to the jury. The appellants contend that the jury was not informed as to the difference between the right of control and the actual exercise of control. In view of our conclusion that a real estate salesman is an agent of the broker, under whose license he operates as a matter of law, the question of control need not be discussed as instructions on that issue were not necessary in the present case. The important question is whether, at the time of the accident in question, Shugg, as such agent, was acting within the course and scope of his employment.

### *Were the Instructions and Rulings as to the Scope of Employment Erroneous?*

The facts leading up to the accident appear to be undisputed: Shugg testified: that on the morning of the accident he was at the office of Davis Realty; that he left the office for the purpose of going to 38th Avenue and Clement Street to try to obtain a listing on a house at that corner on behalf of Davis Realty; that his sole intention upon leaving the office was to look at that property; that Davis Realty is located at

14th Avenue and Geary Boulevard; that he drove north one block to Clement Street and then drove west on Clement; that as he started out on Clement Street he noticed it was around noon, so he decided to stop by at his home for lunch and then continue out to look at the property after lunch; that he was driving west on Clement Street, somewhere between 14th and 26th Avenues when he made this decision; that he lived on 32nd Avenue, two blocks north of Clement Street;[15] that the entire trip from Davis Realty to 38th Avenue and Clement Street would have involved a distance of about 21 blocks; that the respondent did not instruct its salesmen as to when or where they should eat lunch; that it was the usual practice to stop at a convenient location for lunch and then continue on with the business of Davis Realty; that he ate lunch at home if he happened to be in the area; that after he reached the decision to eat lunch at home he continued along Clement Street.[16]

It is elementary that the liability of the principal or employer is predicated upon the fact of employment. Accordingly, the principal or employer is not liable for the acts of his agent or employee while the latter is pursuing his own ends, even though the injury complained of could not have been committed without the facilities afforded to the agent or employee by his relation to his principal or employer. (*Kish* v. *California State Automobile Assn.*, 190 Cal. 246, 248 [212 P. 27].) Therefore, whether or not the principal or employer is responsible for the act of the agent or employee at the time of the injury depends upon whether the agent or employee was engaged at that time in the transaction of the business of his principal or employer, or whether he was engaged in an act which was done for his own personal convenience or accommodation and related to an end or purpose exclusively and individually his own. (*Kish* v. *California State Automobile Assn.*, supra, pp. 248-249.) Accordingly, it is the general rule that an employee on his way to lunch, even though he is driving an automobile which is the property of the master, is not engaged in furthering any end of the employer, and that therefore under such circumstances, the servant is not acting with-

---

[15]The contemplated detour for lunch thus involved a distance of two blocks from a direct route to his destination at 38th Avenue and Clement Street.

[16]The accident took place at 26th Avenue and Clement Street and prior to reaching his home or his ultimate destination.

in the scope of his employment. (*Carnes* v. *Pacific Gas & Elec. Co.*, 21 Cal.App.2d 568, 572 [69 P.2d 998, 70 P.2d 717]; *Peccolo* v. *City of Los Angeles*, 8 Cal.2d 532, 535-536 [66 P.2d 651]; *Adams* v. *Tuxedo Land Co.*, 92 Cal.App. 266, 269-270 [267 P. 926]; *Helm* v. *Bagley*, 113 Cal.App. 602, 605 [298 P. 826]; *Martinelli* v. *Stabnau*, 11 Cal.App.2d 38, 40 [58 P.2d 956].) ▮▮▮ The so-called "lunch hour rule," enunciated by the foregoing cases, is, however, subject to an exception termed the "dual or combined purpose rule." The latter rule was stated thusly in *Ryan* v. *Farrell*, 208 Cal. 200 [280 P. 945]: "[W]here the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be held responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master." (P. 204.) This rule was followed and applied in *Cain* v. *Marquez*, 31 Cal.App.2d 430, 441 [88 P.2d 200]; *Loper* v. *Morrison*, 23 Cal.2d 600, 606 [145 P.2d 1]; and *Fuller* v. *Chambers*, 169 Cal.App.2d 602, 608 [337 P.2d 848].

In *Ryan*, an automobile salesman made a trip from San Diego to Pacific Beach to interview a prospective purchaser and was making the return trip when he injured the plaintiff. It was there held that an employee who has gone upon an errand on behalf of his master does not cease to be acting in the course of his employment at the moment he starts upon the return trip after having performed the errand. The *Cain* case held that there were facts sufficient to warrant the case going to the jury on the issue as to whether the employee was acting within the scope of his employment where the employee went home in his own car to get tools to be used in his employer's work, then went to dinner, and on his way back to work became involved in an accident. *Loper*, on its facts, is similar to the case at bench. There a milk route employee, Morrison, left his employer's place of business in his own (Morrison's) car for the purpose of collecting a delinquent account owed his employer by a Mrs. Hanson, a customer on his route. Morrison was accompanied by a fellow employee, Dolan, whom he had offered a ride home. Upon finding that Mrs. Hanson was not at home Morrison decided to call again later. While waiting for Mrs. Hanson to return, Morrison went with Dolan to a tavern near Dolan's home for sandwiches and beer, and then took Dolan home. While returning from

Dolan's home on his way to the Hanson home Morrison was involved in an accident. Dolan lived about 2 miles outside the area covered by the milk route and the accident occurred before Morrison reached the boundaries of his route. The court there held that it could not determine as a matter of law that the employee was outside the scope of his employment, the test being whether there had been a deviation so material or substantial as to constitute a complete departure, and that this determination was a question of fact. The Supreme Court went on to state that "[t]he employer's liability was not necessarily terminated by reason of the fact that Morrison combined a private purpose of his own with the business of his employer." (P. 606; citing the above rule announced in *Ryan.*) In *Fuller* an employee was driving a company car from San Francisco to Fresno on business. Instead of going by the most direct route, i.e., via Gilroy and Pacheco Pass, he detoured by way of Camp Roberts in Monterey County to pick up friends. The accident occurred after leaving Camp Roberts about 16 miles out of Lemoore (Kings County) along Route 41 toward Fresno. Applying the legal principle expressed in *Ryan,* the court held that there was sufficient evidence to support a finding that the employee was acting within the course and scope of his employment.

The "dual or combined purpose rule" was recognized also in *Richards* v. *Metropolitan Life Ins. Co.,* 19 Cal.2d 236 [120 P.2d 650]. There an insurance agent in the employ of Metropolitan Life Insurance Company used his own car in soliciting insurance, in delivering policies, in collecting premiums and in trips to the company's office. He paid all expenses of maintaining and operating said car. He was required by the company to attend daily meetings at its office in the morning. On the morning of the accident the employee was on his way from his home to the office of the company to attend a meeting of the agents and to deliver premiums collected on the day previous. Because his duties encompassed both office and field work in a territory allocated to him by the company, and because he had to attend daily meetings at the company's office and was required to deliver premiums at such office either before or after doing such field work, the Supreme Court held that there was substantial evidence before the trial court on the issue as to whether the agent was acting within the course of his employment at the time of the accident to warrant the denial of a motion for nonsuit.

In the instant case it cannot be said that at the time

of the accident Shugg was engaged in an act which was done for his own personal convenience or accommodation and related to an end or purpose exclusively and individually his own. The testimony shows that, initially, his sole intent was to attend to the business of his principal at 38th Avenue and Clement Street. En route, he decided to combine his business with that of Davis Realty. This is the extent of his deviation. Moreover, we do not even have a departure from the original route of travel as was the case in *Cain, Loper* and *Fuller*. The court below would, therefore, have been justified in giving an instruction based upon the legal principle declared in *Ryan.* Such an instruction was proposed by the appellants,[17] but was not given.[18] ■■■ Instead, after giving instructions defining generally the terms "principal" and "agent," the scope of an agent's authority, the meaning of "course and scope of employment" (including appellants' proposed instruction set out in footnote 18), and an instruction based upon the "return from an errand" principle (also declared in *Ryan*), the court below gave the following instruction: "An employee driving his own car to a meal may or may not be acting in the course and scope of his employment even though he is traveling with the intention of resuming his duties after eating. If the primary purpose of the trip is for the meal, then he is not in the course and scope of his employment. If the primary purpose is for the business of his employer, then he is within the course and scope of his employment." This instruction is clearly erroneous, and materi-

[17] "The liability of a principal for the conduct of its agent is not necessarily terminated by the fact that the agent is combining a private purpose of his own with the business of his principal. Where the agent is combining his own business with that of his principal, or is attending to both at substantially the same time, the principal is held responsible for the agent's conduct unless it clearly appears that the agent could not have been serving his principal directly or indirectly."

[18] The proposed instruction bears the judge's notation "Given as Modified," however, it was not given by the court. By this notation, the court apparently meant to indicate that the substance of this instruction was included in other instructions given. The following instruction submitted by the appellants was given: "When an agent is in truth acting on his principal's behalf and within the scope of his authority, if while so engaged, he also and incidentally attends to some matter strictly personal to himself, his doing so does not break the agency relation so as to release the principal from responsibility for the agent's conduct. On the other hand, when an agent departs from the business or service that has been assigned to him expressly or impliedly by his principal, and pursues some activity or object not for his principal and not reasonably embraced within his employment, but for the agent's own pleasure or purpose, the principal is not responsible for anything done or not done, in such activity."

ally at variance with the principle announced in *Ryan*. The rule in *Ryan* is not reduced to a determination of which business (i.e., his own or that of the master) is primary or dominant, or even as to which business the servant was actually engaged in at the time of the accident, but to whether, at such time, the servant is *combining* his own business with that of his master or attending to both at substantially the same time. The essential inquiry, in each instance, is whether there has been a deviation so material or substantial as to constitute a complete departure from the agent's strict course of duty, and this determination is usually a question of fact. (*Loper* v. *Morrison, supra,* 23 Cal.2d 600, 606-607; *Fuller* v. *Chambers, supra,* 169 Cal.App.2d 602, 608-609; *Westberg* v. *Willde,* 14 Cal.2d 360, 372-373 [94 P.2d 590].) The applicable rule has been stated thusly: "One does not cease to be acting within the course of the master's employment because his most direct and immediate pursuit of the master's business is subject to necessary, usual or incidental personal acts, nor even by slight and immaterial delays or deflections from the most direct route for a personal or private purpose, the pursuit of the master's business continuing to be the controlling purpose. Such acts, not amounting to a turning aside completely from the master's business so as to be inconsistent with its pursuit, are often only what might be reasonably expected, to which, therefore, the master's assent may be fairly assumed; or they are in many instances the mingling with the pursuit of the master's business some purpose of the servant's own." (Shearman & Redfield on Negligence (6th ed) § 147a; cited with approval in *Kruse* v. *White Brothers,* 81 Cal.App. 86, 92-93 [253 P. 178]; *Westberg* v. *Willde, supra,* pp. 372-373; *Fuller* v. *Chambers, supra,* p. 608.)

The respondent asserts that even if the above instruction is erroneous, it is the result of invited error on the part of the appellants. Although the said instruction bears the notation that it was requested by the respondent, the respondent maintains that this instruction was not submitted by it, but was one prepared by the court, pursuant to the stipulation and agreement of the parties. The respondent has filed a motion herein seeking to augment the record to show that the said instruction was given by stipulation and agreement of the parties. The motion is supported by an affidavit of counsel for the respondent to the effect that the subject instruction was a modification of an instruction submitted by it[19] after a con-

---

[19]The proposed instruction No. 10 read as follows:

"An employee driving his own car to a meal is not acting in the

ference in the chambers of the trial judge, during which both sides agreed and stipulated that the instruction in the form in which it was ultimately given would correctly state the law and be acceptable to both sides. The said affidavit states further that the said modified instruction was prepared by the clerk of the court at the direction of the judge. This latter assertion is supported by an affidavit executed by the said clerk and by the court reporter for the said trial judge. Counsel for appellants, in turn, has filed a counteraffidavit to the effect that it is true that the court did modify the respondent's said proposed instruction, after appellants objected to it, and that the trial court did direct either the clerk or the court reporter to type the proposed instruction as modified. Appellants' counsel denies, however, that he agreed or stipulated to the instruction as modified, and denies that he stipulated or agreed that it was a correct statement of the law. ■■■ We thus have a sharp conflict in the affidavits. In such a case we should resolve the conflicts against the party who challenges the action taken by the court below. Since all intendments are in favor of such action, we must give considerable weight to the designation by the court as appears in the reporter's transcript to the effect that the instruction in question was given at the request of the respondent. (See *Cameron* v. *Cameron*, 110 Cal.App.2d 258, 261 [242 P.2d 408]; *DeWit* v. *Glazier*, 149 Cal.App.2d 75, 81-82 [307 P.2d 1031].) The proposed instruction was an erroneous statement of the law. The instruction given, even if considered as a modification of the one proposed, did not cure the error. It appears, therefore, that the error was invited by the respondent, rather than by the appellants. Moreover, it would avail nothing to augment the record to reflect the notation requested by the respondent because this cause will have to be retried, in any event, in view of the other prejudicial error in the record.

■■■ The appellants also assign as error the sustaining of an objection to the following question directed to Shugg: "And would you say it was only an incidental purpose when you decided to change your route to stop by your house and get something to eat?" The objection was sustained on the ground that it was for the jury to determine Shugg's primary purpose. The question was clearly objectionable because it called for the witness' conclusion. The extent and substanti-

---

course and scope of his employment even though he is traveling with the intention of resuming his duties after eating."

ality of Shugg's deviation, if any, was a question of fact for the jury.

The respondent's motion to augment the record is denied. The judgment is reversed.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied May 8, 1963, and respondent's petition for a hearing by the Supreme Court was denied June 12, 1963.